IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNIVERSAL AMERICAN CORP., | ) ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) ) | C.A. No. 13-1741-RGA |
| PARTNERS HEALTHCARE SOLUTIONS HOLDINGS, L.P., GTCR GOLDER RAUNER II, L.L.C., GTCR PARTNERS IX, L.P., GTCR FUND IX/A, L.P., GTCR FUND IX/B, L.P., GTCR CO-INVEST III, L.P., DAVID KATZ, GREGORY SCOTT, JEROME VACCARO and JOHN McDONOUGH, | ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.    UAM HAS FAILED TO STATE A COMMON LAW FRAUD CLAIM BASED ON ALLEGED EXTRA-CONTRACTUAL STATEMENTS OR OMISSIONS. ............. 1

    A.    The Anti-Reliance Provision is an Absolute Bar to Common Law Fraud Claims Based on Extra-Contractual Representations. ........................................... 1

    B.    *TransDigm* Does Not Support UAM's Attempt to State a Common Law Fraud Claim Based on Alleged Extra-Contractual Omissions. ............................ 2

    C.    UAM Cannot State a Fraud Claim Based on Extra-Contractual Projections. ........................................................................................................... 3

II.    UAM'S § 10(B) CLAIMS ARE NOT PLED WITH PARTICULARITY. ....................... 5

    A.    Scienter Is Not Pled by Listing Every Officer's Name For Every Allegation. ........................................................................................................... 6

    B.    UAM's Theory of Liability Requires That Defendants Intended to Commit Fraud Against Themselves, Which Undercuts Any Inference of Scienter. ............ 7

    C.    All Three Officers, APS, and APSLP Did Not Make Every Statement. ................ 8

    D.    UAM Failed to Plead Transaction Causation For Pre-Signing Statements. ......... 10

III.    UAM FAILS TO SATISFY THE ELEMENTS OF § 20(A) LIABILITY. ..................... 11

    A.    Culpable Participation Requires More Than "Actual Knowledge." ..................... 11

    B.    UAM's Generalized Allegations Cannot Establish Defendants' "Control." ........ 13

IV.    ABSTENTION AND/OR DISMISSAL OF VACCARO'S EMPLOYMENT CLAIMS IS REQUIRED. ................................................................................................. 15

CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abry Partners V., L.P. v. F&W Acquisition LLC*,
891 A.2d 1032 (Del. Ch. 2006) ............................................................................. 1, 3

*Antinoph v. Laverell Reynolds Sec., Inc.*,
No. 88-3664, 1989 WL 102585 (E.D. Pa. Sept. 5, 1989) ......................................... 15

*BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*,
No. 20456, 2004 WL 1739522 (Del. Ch. Aug. 3, 2004) ..................................... 3, 4, 5

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013) ....................................................................... 6, 7

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013) ............................................................................. 11, 13

*Dudley v. Haub*,
No. 2:11-05196 (WJM), 2013 WL 1845519 (D.N.J. Apr. 30, 2013) ........................... 8

*Great Lakes Chem. Corp. v. Pharmacia Corp.*,
788 A.2d 544 (Del. Ch. 2001) ............................................................................. 1, 3

*Haw. Ironworkers Annuity Trust Fund v. Cole*,
No. 3:10-CV-371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) ............................. 10

*In re Coinstar Inc. Sec. Litig.*,
No. C11-133 MJP, 2011 WL 4712206 (W.D. Wash. Oct. 6, 2011) ........................... 10

*In re Digital Island Sec. Litig.*,
223 F. Supp. 2d 546 (D. Del. 2002) .............................................................. 7, 12, 13

*In re Digital Island Sec. Litig.*,
357 F.3d 322 (3d Cir. 2004) ..................................................................................... 8

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) ...................................................................... 8

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................................... 14

*In re Intelligroup Sec. Litig.*,
527 F. Supp. 2d 262 (D.N.J. 2007) ......................................................................... 10

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005) ..................................................................... 14

*Janus Capital Grp., Inc. v. First Derivative Traders,*
   131 S. Ct. 2296 (2011) ................................................................................ 8, 9, 10

*Joyce v. Bobcat Oil & Gas, Inc.,*
   No. 1:CV-07-1421, 2008 WL 919724 (M.D. Pa. Apr. 3, 2008) .............................. 10

*Kalnit v. Eichler,*
   85 F. Supp. 2d 232 (S.D.N.Y. 1999) ......................................................................... 14

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   259 F.3d 154 (3rd Cir. 2001) ..................................................................................... 11

*O'Brien v. Progressive N. Ins. Co.,*
   785 A.2d 281 (Del. 2001) ............................................................................................. 2

*Percoco v. Deckers Outdoor Corp.,*
   No. 3:99-CV-237-MCK, 2013 WL 3584370 (D. Del. July 8, 2013) ......................... 8

*Rochez Bros. v. Rhoades,*
   527 F.2d 880 (3d Cir. 1975) ...................................................................................... 14

*Seven Invs., LLC v. AD Capital,* LLC,
   32 A.3d 391 (Del. Ch. 2011) ..................................................................................... 15

*Skeway v. China Natural Gas, Inc.,*
   No. 10-728-RGA, 2012 WL 2877645 (D. Del. July 6, 2012) .......................... 13, 14

*Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.,*
   739 F. Supp. 2d 686 (D. Del. 2010) .......................................................................... 14

*Steamfitters Local 449 Pension Fund v. Alter,*
   No. 09-4730, 2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ..................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007) ..................................................................................................... 7

*TransDigm Inc. v. Alcoa Global Fasteners, Inc.,*
   No. 7135-VCP, 2013 WL 2326881 (Del. Ch. May 29, 2013) ............................ 1, 2, 3

*Virginia Bankshares, Inc. v. Sandberg,*
   501 U.S. 1083 (1991) ............................................................................................... 4, 5

*VLIW Tech., LLC v. Hewlett-Packard Co.,*
   840 A.2d 606 (Del. 2003) ............................................................................................ 2

*Wal-Mart Stores v. AIG Life Ins. Co.,*
   901 A.2d 106 (Del. 2006) ........................................................................................ 4, 5

iii

*Winer Family Trust v. Queen,*
   503 F.3d 319 (3d Cir. 2007) ........................................................................................... 6

## INTRODUCTION

As detailed in Defendants' opening brief (the "Motion") and as discussed further below, this Court should dismiss UAM's claims as a matter of law.

## ARGUMENT

## I.   UAM HAS FAILED TO STATE A COMMON LAW FRAUD CLAIM BASED ON ALLEGED EXTRA-CONTRACTUAL STATEMENTS OR OMISSIONS.

UAM's common law fraud claims based on alleged extra-contractual statements or omissions are barred by the Merger Agreement's Anti-Reliance Provision and Delaware law, which bind UAM to its promise to rely only on representations expressly made in Article 3 or the Officer's Certificate. (Merger Agreement § 3.34, D.I. No. 46, Ex. A.) UAM cannot escape its commitment by recharacterizing alleged extra-contractual misrepresentations as omissions of truth. (*See* Opinion, D.I. No. 36 ("Op."), at 10 (discussing *TransDigm Inc. v. Alcoa Global Fasteners, Inc.*, 2013 WL 2326881 (Del. Ch. May 29, 2013)).) Apart from the bar imposed by the Anti-Reliance Provision, UAM's common law fraud claims based on new business pipelines and the 2012 budget must be dismissed because they are based on projections and therefore are not actionable as a matter of law. *See Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001).

### A.   The Anti-Reliance Provision is an Absolute Bar to Common Law Fraud Claims Based on Extra-Contractual Representations.

"[S]ophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form part of the basis for their decision to contract." *Abry Partners V., L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006) (citation omitted). Recognizing *Abry*'s force, UAM attempts to diminish the significance of the Anti-Reliance Provision by arguing that it "has a limited temporal scope" and does not apply to extra-contractual statements made between signing and closing because the provision uses

present and past verb tenses. (UAM's Answering Brief, D.I. No. 48 ("Resp."), at 26.) UAM is wrong. The Anti-Reliance Provision's unambiguous terms make Article 3 and the Officer's Certificate the *exclusive sources* of potentially actionable representations. (Merger Agreement § 3.34.)[1] The provision employs present and past verb tenses precisely because it covers all potentially actionable representations through closing when the Officer's Certificate was delivered. UAM's interpretation would render pointless both the provision's reference to the Officer's Certificate and the parties' careful efforts to negotiate which representations would be included in the certificate because, according to UAM, the Anti-Reliance Provision permits reliance on *any* statement between signing and closing regardless of whether it was included in the certificate. *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (affirming dismissal because "[c]ontracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless'" (citation omitted)). Thus, the Anti-Reliance Provision is not "reasonably or fairly susceptible" to UAM's interpretation, as required to create a dispute about its meaning. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003).

### B. *TransDigm* Does Not Support UAM's Attempt to State a Common Law Fraud Claim Based on Alleged Extra-Contractual Omissions.

In ruling on Defendants' first motion to dismiss, the Court explained that the *TransDigm* omissions theory "is limited" and "simply characterizing something as an 'omission' does not render the anti-reliance provision a nullity." (Op. at 10.) The Court instructed UAM to plead "active concealment" if it pursued this theory. (*Id.* at 9–10.) In an attempt to avoid the Anti-Reliance Provision, UAM failed to heed the Court's instructions and repeatedly recharacterizes alleged misrepresentations as omissions. (Motion to Dismiss, D.I. No. 45 ("Mot."), at 8–9.)

---

[1]   "NEITHER PARENT NOR THE MERGER SUB IS RELYING OR HAS RELIED ON ANY REPRESENTATIONS AND WARRANTIES EXCEPT FOR THOSE EXPRESSLY MADE BY THE COMPANY IN THIS ARTICLE 3 (OR THE CERTIFICATE DELIVERED PURSUANT TO SECTION 6.2(h)(i) OF THIS AGREEMENT)."

In opposing Defendants' Motion, UAM tries to squeeze its allegations into the *TransDigm* mold by asserting that "Scott, Vaccaro, and McDonough . . . refused Universal's requests for access to APS's salesforce.com database." (Resp. at 27.) According to the Amended Complaint, UAM signed the Merger Agreement with full knowledge that it had requested and not received this information—a far cry from *TransDigm*, where the buyer was unaware that it was being denied information. *TransDigm*, 2013 WL 2326881, at *2. UAM's request for this information and Defendants' alleged refusal does not plead "active concealment," but pleads how UAM had full awareness that it lacked this information when it decided to purchase APS.

In fact, none of UAM's extra-contractual fraud claims concern "active concealment." The allegations consistently involve *representations*, such as presentations involving new business pipelines and a budget forecast. (*See, e.g.,* Am. Compl. Count VII – Fraud: Extra-contractual Statements and Omissions, referencing ¶ 136 (August Pipeline); ¶ 137 (October Pipeline); ¶ 138 (November Pipeline); ¶ 140 (retention of Customer B business); ¶ 142 (December Pipeline); ¶ 143 (2012 Budget); and ¶ 146 (February Pipeline).) These extra-contractual representations cannot be relabeled as omissions without gutting the Anti-Reliance Provision and the rule set forth in *Abry*. Tellingly, UAM fails to respond to Defendants' argument that UAM's reading of the *TransDigm* exception would render *Abry* meaningless. (*See* Mot. at 8–9.)

### C.     UAM Cannot State a Fraud Claim Based on Extra-Contractual Projections.

Independent of the Anti-Reliance Provision, UAM cannot state a fraud claim based on extra-contractual representations because the new business pipelines and budget that are central to the Amended Complaint are projections. As explained in UAM's leading case on projection-based claims, "[e]xpressing opinions or predictions about the future . . . 'cannot give rise to actionable common law fraud.'" *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *7 (Del. Ch. Aug. 3, 2004) (quoting *Great Lakes*, 788 A.2d at 554).

UAM insists that it has stated a claim based on extra-contractual projections because Defendants "misrepresented their own beliefs when they [presented the pipelines] as though it was their actual opinion."[2] (Resp. at 25–26.) According to UAM, Defendants' true forecasts were captured by the salesforce.com projections. (*See id.*) To support its contention that it can state a fraud claim based on projections, UAM cites *BAE Systems* and *Wal-Mart Stores v. AIG Life Ins. Co.*, 901 A.2d 106 (Del. 2006). Neither case remotely suggests that ***projections***, as opposed to statements of implied fact, are actionable as fraud.

In *BAE Systems*, Lockheed alleged two fraud claims. First, it alleged that "BAE committed fraud by not disclosing its intent not to perform its obligations (to defend [a lawsuit] as if all damages were for its account) under (Lockheed's interpretation of) the Transaction Agreement." *BAE Sys.*, 2004 WL 1739522, at *8. That claim involved no opinions or projections and was dismissed as a bootstrapped "rehash" of Lockheed's breach of contract claim. *Id.* The second fraud claim was based on BAE's alleged duty to speak to correct misrepresentations. *Id.* Two alleged misstatements were "statements of prediction and opinion" (as opposed to fact) about the strength of BAE's case. *Id.* The court held that such statements of opinion and prediction were not actionable, and the fraud claims were dismissed. *Id.*

Despite the fact that *BAE Systems* actually supports Defendants' position, UAM cites it for dicta from a footnote: "a statement of belief may be open to objection . . . solely as a misstatement of the psychological fact of the speaker's belief in what he says." *Id.* at *7 n.50 (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991)). But this quote doesn't accurately reflect *Virginia Bankshares*, which further explained that "proof of mere disbelief or belief undisclosed should not suffice for liability under §14(a)." *Virginia Bankshares*, 501 U.S. at 1096. More to the point, *Virginia Bankshares* did not involve

---

[2] This also demonstrates that UAM is alleging misrepresentations, not omissions, in its extra-contractual counts.

projections or common law fraud. *Id.* ("We therefore hold disbelief or undisclosed motivation, standing alone, insufficient to satisfy the element of fact that must be satisfied under §14(a)."). This case is entirely irrelevant to UAM's fraud claims based on projections.

*Wal-Mart* is similarly unhelpful to UAM. That case involved Wal-Mart's purchase of corporate-owned life insurance (COLI) policies designed to generate tax deductions. *Wal-Mart*, 901 A.2d at 110–11. Tax law changes were going to diminish these benefits, so Wal-Mart hired the defendants to minimize that adverse impact. *Id.* The policies allegedly suffered from various "structural flaws." *Id.* at 115–16. Wal-Mart sued the defendants for fraud, alleging that they "misrepresented the viability of the COLI plans." *Id* at 116. The Delaware Supreme Court held that Wal-Mart had stated a claim, not due the defendant's expressions of opinion—"an expression of opinion cannot form the basis of a fraud claim"—but because the alleged opinions were actually "misrepresentations of implied fact." *Id.* at 115–16. UAM does not argue that the pipelines and projections are statements of implied fact. And for good reason. Statements about future business prospects are quintessential projections that, as the cases cited by UAM illustrate, are not actionable as fraud. *See, e.g., BAE Systems*, 2004 WL 1739522, at *7.

For these reasons and those set forth in Defendants' Motion, Counts IV through XI for common law fraud should be dismissed in their entirety.

## II.   UAM'S § 10(B) CLAIMS ARE NOT PLED WITH PARTICULARITY.

UAM's amended claims against former APS officers Scott, Vaccaro, and McDonough and APSLP under § 10(b) of the Exchange Act once again fail to satisfy the requirements of the Private Securities Litigation Reform Act ("PSLRA"). While UAM strains to tie all four defendants to every alleged misstatement, it does not plead a strong inference of scienter for each alleged misstatement or that all four defendants were the "maker" of nearly every alleged misstatement as required by this Court and Supreme Court precedent.

**A.      Scienter Is Not Pled by Listing Every Officer's Name For Every Allegation.**

In dismissing UAM's original Complaint, this Court explained that UAM had improperly charged groupings of "APS," "Defendants," and the "Individual Defendants" with "certain knowledge or actions"—a tactic insufficient to plead § 10(b) liability. (Op. at 5.) In response, UAM replaced these shorthand labels with "Scott, Vaccaro, McDonough, APS, and APSLP" for "virtually all" allegations in the Amended Complaint, including those that UAM concedes cannot be asserted against Vaccaro and McDonough under § 10(b) because they did not sign the Merger Agreement or Officer's Certificate.[3] (Mot. 13–17; Resp. at 14, 5 n.2.) UAM does not dispute this. Instead, it asks the Court to focus on select allegations it contends are sufficiently pled. UAM cannot allege specific facts for some misstatements and group plead the rest without violating the Third Circuit's prohibition on "group pleading," which requires that UAM "specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions." *Bartesch v. Cook*, 941 F. Supp. 2d 501, 510 (D. Del. 2013) (quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 335–36 (3d Cir. 2007)). UAM does not plead scienter by repeating the phrase "Scott, Vaccaro, McDonough, APS, and APSLP" throughout its 104-page complaint.

UAM fares no better where it attempted to make specific allegations. For example, UAM cannot plead that Scott had scienter regarding "Material Adverse Effect[s]" by citing allegations that "Vaccaro and McDonough received written notice," "Vaccaro and McDonough were told," and "McDonough learned" of events. To do so attempts to impute scienter to Scott based on another officer's knowledge. (Resp. at 7–8.) And UAM does not plead scienter for undisclosed regulatory liabilities by alleging that "a *qui tam* action was served on APS after the merger closed" and other unproven allegations "impl[y] that senior APS management was directly

---

[3]   For the same reason, the Court dismissed UAM's common law fraud claims against Vaccaro and McDonough that relate to the Merger Agreement and the Officer's Certificate. (Op. at 8.)

involved in the alleged misconduct." (Resp. at 6); *see Bartesch*, 941 F. Supp. 2d at 507 ("As other courts in the Third Circuit have held, 'it [is] not appropriate for the Court to give weight to the allegations in [a] *qui tam* case,' because such allegations 'are unproven and contested [and] do not amount to "facts" sufficient to establish a strong inference of scienter.'" (citation omitted)). Similarly, the Amended Complaint does not plead how any Defendant had scienter with respect to the so-called "Software Misrepresentation." (*See, e.g.,* Am. Compl. ¶ 131(b) ("the Software Misrepresentation was . . . made with scienter because over half of the code in the Software is subject to the Software License"); ¶ 141 (same).) Thus, probing UAM's blanket allegations only confirms that it has insufficiently pled scienter under § 10(b).

**B.**     **UAM's Theory of Liability Requires That Defendants Intended to Commit Fraud Against Themselves, Which Undercuts Any Inference of Scienter.**

UAM has pled the requisite "strong inference" of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *see also In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 554 (D. Del. 2002) (to assess whether scienter is pled, "courts assume that the defendant would act in his or her economic self-interest"). According to UAM, Scott, Vaccaro, and McDonough conspired to defraud UAM by selling them a business that they knew "was rotten to the core." (Resp. at 2.) The alleged motive of these "masterminds of the fraud" was to (1) secure jobs with UAM to continue running the "rotten" APS and (2) acquire stock and stock options in UAM—their fraud victim. (Resp. at 12; Am. Compl. ¶ 13). And, rather than secure the entire purchase price for APS in cash, GTCR received $80 million in UAM stock and tied more than 20% of the purchase price (up to another $50 million) to APS meeting future earnings projections.[4] Under the facts

---

[4]     Am. Compl. ¶ 90; Merger Agreement § 2.13(b)(ii); Co. Disclosure Letter § 1.1(a), attached hereto as Ex. A.

pled by UAM, Defendants were confident enough in APS's future to tie their fates directly to APS's success, undermining any strong inference of scienter. *See In re Digital Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004) ("Because Plaintiffs' allegations show that Defendants' interests were at all times tied to the value of their shares, we have no basis to infer the sort of conscious disregard and deliberate ignorance required to plead scienter."). UAM argues that these undisputed facts cannot negate their efforts to plead scienter on a motion to dismiss. (Resp. at 12). But courts routinely hold to the contrary.[5] UAM's allegations show that "APS's post-merger performance fell substantially short of both parties' expectations," not a strong inference of scienter to commit fraud. (Op. at 1.)

### C.    All Three Officers, APS, and APSLP Did Not Make Every Statement.

UAM contends that "the Amended Complaint spells out which of Scott, Vaccaro, and McDonough made each extra-contractual misrepresentation," but—in the next sentence— clarifies that "virtually all of the extra-contractual misrepresentations were cooked up together by Scott, Vaccaro and McDonough," and all three officers (plus APS and APSLP) should be seen as the "maker" of these statements for § 10(b) liability. (Resp. at 14.) UAM's allegations violate *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011).

*First*, UAM asserts that all three Defendants (and APSLP) "created and delivered," "collectively prepared and delivered," or "prepared . . . collectively" all of the pipelines and pre-closing presentations. (Resp. at 14.) However, neither "creat[ing]" nor "prepar[ing]" is sufficient

---

[5]    *See, e.g., Dudley v. Haub*, 2013 WL 1845519, at *21 (D.N.J. Apr. 30, 2013) (dismissing § 10(b) claim because defendants "would not be motivated to commit a fraud that would destroy $115 million of their own equity"); *Percoco v. Deckers Outdoor Corp.*, 2013 WL 3584370, at *6 (D. Del. July 8, 2013) (dismissing § 10(b) claims because "a compelling inference *against* scienter is raised when individual defendants" increase their equity holdings before the alleged fraud is disclosed (emphasis added)); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001) (dismissing § 10(b) claim because increasing equity holdings is "wholly inconsistent with the[] contention that [an officer] knew undisclosed negative information about the Company"). UAM states that these cases should apply only if scienter allegations are "circumstantial," but cites no authority for that contention. (Resp. at 12.)

to qualify one as a "maker" under § 10(b). *See Janus*, 131 S. Ct. at 2302–2303 (rejecting the argument that "'make' should be defined as 'create'" because it would impose liability on a person "who provides the false or misleading information that another person then puts into the statement" (citation omitted)). For § 10(b) liability, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Id.* at 2302. Generally alleging that "Scott, Vaccaro, McDonough, on behalf of APS and APSLP" "prepared . . . collectively" "virtually all" of the alleged extra-contractual misstatements made during the eight months prior to the Merger's closing fails to plead "which specific defendant" had "ultimate authority" over each extra-contractual misstatement, as required by this Court and *Janus*. (Mot. at 14–15; Resp. at 14; Op. at 5.)[6]

**Second**, UAM argues that the December and February new business pipelines are "at least 'implicit[ly]' attributable" to Scott, Vaccaro, McDonough, and APSLP because all three officers attended presentations in August, October, and November 2011 when earlier pipelines were discussed. (Resp. at 14–15.) UAM also argues that the "2012 Budget was implicitly attributed to all three APS [officers]," although it points to no specific factual allegations showing their connection to the budget. (*Id.* at 15.) UAM cannot make an end run of § 10(b)'s prohibition on aiding and abetting liability by asserting that every misstatement is "implicitly attributed" to all defendants, such that each alleged aider and abettor is a "maker" for § 10(b) purposes. Nor can Scott, Vaccaro, McDonough, and APSLP all "implicitly" be the "maker[s]" of every extra-contractual statement without UAM alleging specific "surrounding circumstances" to

---

[6]   Regardless, the Amended Complaint fails to show that all three officers were the "maker" of every extra-contractual statement. (*See, e.g.,* Am. Compl. ¶ 100 ("McDonough's cost projections, created in consultation with Scott and Vaccaro"); ¶ 112 (Vaccaro "had participated in creating and determining the contents of the sham pipelines"); ¶ 57 (pipelines created "with the knowledge and approval of Scott").)

substantiate that contention. *Janus*, 131 S. Ct. at 2302.[7] UAM's failure to plead with particularity how every extra-contractual misrepresentation is "implicitly attributed" to all three officers warrants dismissal of UAM's § 10(b) claims.

### D.   UAM Failed to Plead Transaction Causation For Pre-Signing Statements.

This Court directed UAM to plead "with particularity . . . how [it] relied on" "each fraudulent statement or representation." (Op. at 5); *see, e.g., In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 292 (D.N.J. 2007) ("plaintiff must still demonstrate reliance by showing a causal link between the misrepresentation and the plaintiff's entry into the transaction which eventually harmed the plaintiff"). UAM's only specific allegation about its reliance on extra-contractual misrepresentations made before the Merger Agreement's execution states that UAM relied "by continuing to devote resources and energy to a possible APS transaction." (Am. Compl. ¶ 163(a)). UAM did not plead that such statements were "material inducements for [UAM] to enter into the Merger Agreement," or that it relied on such statements "when it agreed to consummate the acquisition of APS," in contrast with its other allegations. (*Cf. id.* ¶¶ 90, 163(b)); *Joyce v. Bobcat Oil & Gas, Inc.*, 2008 WL 919724, at *6 (M.D. Pa. Apr. 3, 2008) ("Transaction causation is a showing that but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security." (citation and internal quotation omitted)). In its Response, UAM invokes only platitudes from the Amended Complaint, such as "[h]ad [UAM] known the appalling truth, it never would have bought APS," or that such extra-contractual statements "reinforced" other later misrepresentations. (Resp. at 17 (citing Am. Compl. ¶¶ 1, 163(a), 165).) Thus, UAM did not plead that extra-contractual misrepresentations

---

[7]   "[N]othing in the Court's decision in *Janus* limits the key holding—the definition of the phrase 'to make . . . a statement' under Rule 10b–5(b)—to legally separate entities." *Haw. Ironworkers Annuity Trust Fund v. Cole*, 2011 WL 3862206, at *3 (N.D. Ohio Sept. 1, 2011); *see also In re Coinstar Inc. Sec. Litig.*, 2011 WL 4712206, at *10 (W.D. Wash. Oct. 6, 2011) (*Janus'* "analysis applies equally to whether [the individual defendant-officers] may be held liable for the misstatements of their co-defendants.").

made before the Merger Agreement's execution "caused [it] 'to engage in the transaction in question.'" *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 174 (3rd Cir. 2001) (citation omitted). For these reasons and those set forth in the Motion, Count I for § 10(b) liability should be dismissed.

## III.    UAM FAILS TO SATISFY THE ELEMENTS OF § 20(A) LIABILITY.

UAM alleges two categories of control persons: *first*, Katz and the GTCR Defendants; and *second*, the alleged primary violators of § 10(b) in Count I (Scott, Vaccaro, and McDonough). UAM does not dispute that it was required to plead its § 20(a) claims with particularity regarding each Defendant's "culpable participation" and "control" of a primary violator. (*See* Mot. at 21.) UAM's Response shows that it did neither: (a) culpable participation is not pled by asserting only that Defendants had "actual knowledge" of misrepresentations and (b) describing duties common to directors generally is insufficient to show "control."

### A.    Culpable Participation Requires More Than "Actual Knowledge."

UAM argues that it "pled culpable participation by virtue of [the APS officers' and Katz's] ***actual knowledge*** of the misrepresentations to [UAM]." (Resp. at II.B.2 (emphasis added and capitalization altered); *id.* at II.C.2.) Pleading "knowledge" does not establish culpable participation as a matter of law. *See, e.g.*, *Steamfitters Local 449 Pension Fund v. Alter*, 2011 WL 4528385, at *11 (E.D. Pa. Sept. 30, 2011) ("[P]leading *knowledge* of the facts underlying the fraud, or even knowledge of the fraud itself, is simply not enough to establish culpable *participation* in the securities violation by an allegedly controlling person."). To plead culpable participation, UAM was required to show "both knowledge of the underlying fraud and that [a defendant's] inaction was 'deliberate and done intentionally to further the fraud.'" (Op. at 6 (quoting *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 485 (3d Cir. 2013)).) This Court cautioned UAM that alleging knowledge alone warranted dismissal of § 20(a) claims. (*See id.* at

11

7 (dismissing § 20(a) claim against Katz where, "[a]t best, the Complaint alleges Katz's knowledge of the misstatements made by APS's representatives").) Yet UAM continues the same practice, and this defect is fatal to Counts II and III of the Amended Complaint.

As Defendants explained, Count II simply asserts that Scott, Vaccaro, and McDonough "culpably participated" in APS's alleged fraud "without reference to any specific acts or omissions." (Mot. at 23; Am. Compl. ¶ 184(a).) UAM's only response—that Scott, McDonough, and Vaccaro "knew about lies made by the others"—does not plead with particularity how these Defendants culpably participated in another's alleged misstatements. (Resp. at 18, 22–23); *see Digital Island*, 223 F. Supp. 2d at 563 (dismissing § 20(a) claims where "the complaint broadly and vaguely alleges that the individual defendants 'participated' in the purported omissions, but is utterly lacking in any details as to when or how this occurred," even though the complaint pled "a factual predicate for the individual defendants' knowledge of the purported misstatements").

As to Count III, UAM does not even respond to Defendants' arguments that UAM group pled Katz's culpable participation and failed to connect Katz to certain allegations. (Mot. at 26.) Instead, UAM lists five points that purport to show Katz's culpable participation. (Resp. at 21.) Each point, however, demonstrates the inadequacy of UAM's allegations. For example, UAM asserts that Katz "helped to prevent" UAM from meeting with Customer A officials, but it never pled with particularity how or when Katz supposedly did this. (*Id.*) Nor does UAM explain how Katz's vague and out-of-context statements of "[w]e'll get you whatever you need on the compliance front" and "'we expect' to 'continue to do business' with Customer B" are particularized facts showing that Katz's participation "was substantial, deliberate, or done with intent to further the fraud." (*Id.*; Mot. at 25–26.) Moreover, even assuming that Katz "reviewed and approved drafts of documents containing misrepresentations," UAM failed to plead that Katz

had "actual knowledge of the fraudulent activity taking place" in those drafts. (Resp. at 21); *Belmont*, 708 F.3d at 485.[8] UAM has not satisfied its "heavy burden of demonstrating culpability" for its § 20(a) claim against Katz. *Digital Island*, 223 F. Supp. 2d at 563.

### B.   UAM's Generalized Allegations Cannot Establish Defendants' "Control."

To establish "control" for purposes of § 20(a), UAM was required to plead that each alleged control person "possesses actual control over the transactions in question." *Id.* at 561. UAM failed to plead the APS officers' "control" because Count II merely alleges that "[b]y reason of their position as the senior officers of APS, Scott, Vaccaro, and McDonough had the power and authority to cause APS" to make misrepresentations in the Merger Agreement and closing documents. (Am. Compl. ¶ 184(a)); *Skeway v. China Natural Gas, Inc.*, 2012 WL 2877645, at *1 (D. Del. July 6, 2012) (holding that the "bare fact" of board membership "is insufficient to show control"). UAM argues that it pled "not only [that these Defendants] had the titles of CEO, COO, and CFO but also acted as such" by controlling APS when each Defendant acted on behalf of APS. (Resp. at 21–22.)

UAM's allegations amount to either (i) Scott, Vaccaro, and McDonough controlled each other when each acted on behalf of APS; or (ii) Scott, Vaccaro, and McDonough controlled themselves when each acted on behalf of APS. Neither is proper. If it is the former, UAM cannot allege in the same claim that, for example, Scott controlled APS when acting through Vaccaro and Vaccaro controlled APS when acting through Scott (*see* Resp. at 18), since both defendants "cannot simultaneously be 'controlling persons' as to each other."[9] *Rochez Bros. v. Rhoades*, 527

---

[8] UAM again points to a Customer B contract, but that contract was *removed* from the last pipeline given to UAM and cannot be a material misrepresentation upon which UAM relied. (Am. Compl. ¶ 97.)

[9] Moreover, the Amended Complaint fails to plead that Vaccaro or McDonough had "the power and authority" to control the contents of the Merger Agreement, Officer's Certificate, or Company Disclosure Letter. Nor can "Scott and Vaccaro [be] liable under § 20(a) for McDonough's misrepresentations to [UAM] on February 14 and February 29," since these allegations fall outside of Count II, which concerns alleged misstatements in the Merger Agreement and related documents. (*Compare* Opp'n at 18, *with* Am. Compl. ¶ 183.)

F.2d 880, 891 (3d Cir. 1975). If it is the latter, UAM cannot distinguish this case from *Kalnit v. Eichler,* 85 F. Supp. 2d 232 (S.D.N.Y. 1999), in which "the plaintiff sought to hold the individual directors of the corporate defendant liable as control persons for misrepresentations and omissions that they themselves were alleged to have made." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 412 (S.D.N.Y. 2005) (explaining the "logical inconsistency that required dismissal of the Section 20(a) claim in *Kalnit*"). As UAM failed to allege an independent violation of the federal securities laws distinct from its Count I allegations, its § 20(a) claim against the same defendants should be dismissed. (*See* Mot. at 22.)

Regarding Count III, UAM's efforts to spell out Katz's director responsibilities—those common to nearly every director—do not show "control." (Resp. at 19–20.) Allegations that Katz asked others for information about APS, emailed with APS's directors, and provided advice on discrete matters shows, at best, that Katz was involved in APS's business, not that he had "a significant degree of day-to-day operational control, amounting to the power to dictate another party's conduct or operations." *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1101 n.12 (C.D. Cal. 2008) (citation omitted); *Skeway*, 2012 WL 2877645, at *1 (control not pled where allegations only showed director had direct involvement in company's day-to-day operations). Nor does Katz's negotiation of APS's sales price show that he "had primary responsibility for APS's overall management and day to day operations or was a 'major player' in those operations." (Op. at 7.) Allegations regarding Katz's role is nothing like the control person in *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686 (D. Del. 2010), who repeatedly communicated directly with the company's largest customer about a contract dispute and then "gave the 'management presentation'" and signed the stock purchase agreement containing misrepresentations about that customer. (Resp., Ex. 2 ¶¶ 25–28, 38–39,

44–46.) Since UAM has "not averred facts stating that [Katz] had 'actual control' to direct the actions of" Scott, Vaccaro, and McDonough, the § 20(a) claim against Katz must be dismissed. *Antinoph v. Laverell Reynolds Sec., Inc.*, 1989 WL 102585, at *5 (E.D. Pa. Sept. 5, 1989).

## IV.   ABSTENTION AND/OR DISMISSAL OF VACCARO'S EMPLOYMENT CLAIMS IS REQUIRED.

On May 9, 2014, Vaccaro sued UAM in Delaware Chancery Court seeking enforcement of his contractual severance rights based upon an amended employment contract dated April 25, 2013 and a severance agreement dated June 28, 2013. These post-Merger contracts, and Vaccaro's corresponding claims, have nothing to do with the core of UAM's Amended Complaint: whether Defendants fraudulently induced UAM into purchasing APS. In its original complaint, UAM failed to mention either contract or Vaccaro's post-merger compliance with them. This entirely undermines UAM's argument that the Court must resolve Vaccaro's employment dispute, based on contracts executed more than a year after the merger, as a necessary prerequisite to resolving this lawsuit. (*See* Resp. at 28–29.)

Furthermore, UAM's new declaratory judgment claim should be dismissed because, as UAM now admits, it knew of Vaccaro's alleged fraud when it executed these post-Merger employment contracts; it just "did not know all of the facts." (Resp. at 30.) Because UAM admits to subsequently affirming its contracts with Vaccaro after it knew about the alleged fraud, dismissal is entirely appropriate. *See Seven Invs., LLC v. AD Capital*, LLC, 32 A.3d 391, 397 (Del. Ch. 2011) ("[T]he Court may dismiss a claim if the plaintiff includes in its pleadings facts that incontrovertibly constitute an affirmative defense to a claim." (citation omitted)).

## CONCLUSION

For the reasons above, Defendants respectfully request that this Court grant Defendants' Motion to Dismiss Counts I–XI, XIII, and XV.

December 12, 2014                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                               /s/ Jon E. Abramczyk
                                               Jon E. Abramczyk (#2432)
                                               Ryan D. Stottmann (#5237)
                                               1201 North Market Street, Suite 1600
                                               Wilmington, DE  19801
                                               Tel:  (302) 658-9200
                                               jabramczyk@mnat.com
                                               rstottmann@mnat.com

                                               *Attorneys for Defendants*

OF COUNSEL:

Reed S. Oslan, P.C.
Scott A. McMillin, P.C.
Richard U. S. Howell
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Tel: (312) 862-2000

## Certificate of Service

I hereby certify that on December 12, 2014, I caused the foregoing to be electronically filed with the Clerk of the court using CM/ECF, which will send notification of such filing to:

> Blake Rohrbacher
> Kelly E. Farnan
> Katharine C. Lester
> RICHARDS LAYTON & FINGER, P.A.
> One Rodney Square
> 920 N. King Street
> Wilmington, DE 19801

I further certify that on December 12, 2014, I caused copies of the foregoing to be served upon the following via electronic mail:

> Blake Rohrbacher
> Kelly E. Farnan
> Katharine C. Lester
> RICHARDS LAYTON & FINGER, P.A.
> One Rodney Square
> 920 N. King Street
> Wilmington, DE 19801
> rohrbacher@rlf.com
> farnan@rlf.com
> lester@rlf.com

*/s/ Ryan D. Stottmann*
Ryan D. Stottmann (#5237)