IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNIVERSAL AMERICAN CORP.,

Plaintiff,

v.

PARTNERS HEALTHCARE SOLUTIONS
HOLDINGS, L.P., GTCR GOLDER
RAUNER II, L.L.C., GTCR PARTNERS IX,
L.P., GTCR FUND IX/A, L.P., GTCR FUND
IX/B, L.P., GTCR CO-INVEST III, L.P.,
DAVID KATZ, GREGORY SCOTT,
JEROME VACCARO, and JOHN
MCDONOUGH,

Defendants.

Civil Action No. 13-1741-RGA

## MEMORANDUM OPINION

Blake Rohrbacher, Esq., Kelly E. Farnan, Esq., Katharine C. Lester, Esq., Richards, Layton &
Finger, P.A., Wilmington, DE; Andrew J. Levander, Esq. (argued), Linda C. Goldstein, Esq.,
Paul C. Kingsbery, Esq., Dechert LLP, New York, NY; Stuart T. Steinberg, Esq., Elisa T.
Wiygul, Esq., Dechert LLP, Philadelphia, PA, attorneys for Plaintiff Universal American Corp.

Jon E. Abramczyk, Esq., Ryan D. Stottman, Esq., Morris, Nichols, Arsht & Tunnell LLP,
Wilmington, DE; Scott A. McMillin, Esq. (argued), Richard U. S. Howell, Esq., Reed S. Oslan,
Esq., Kirkland & Ellis LLP, Chicago, IL, attorneys for Defendants Partners Healthcare Solutions
Holdings, L.P., *et al.*

March **31**, 2016

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Before the Court is Defendants' Motion to Dismiss Universal's First Amended and Supplemental Complaint. (D.I. 44). The motion has been fully briefed (D.I. 45, 48, 49). The Court heard oral argument. (D.I. 54). For the reasons that follow, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I.      BACKGROUND

This dispute arises out of a merger between plaintiff Universal American Corporation and Partners Healthcare Solutions, Inc. ("APS"). Universal provides insurance and health benefits mainly to enrollees in the federal Medicare program. (D.I. 39 ¶ 30). APS offers specialty health care solutions that enable its customers, primarily state Medicaid agencies, to improve the quality of care and decrease costs. These services include case management and care coordination, clinical quality and utilization review, and behavioral health services. (*Id.* ¶¶ 31-32).

APS's post-merger performance fell substantially short of both parties' expectations. Universal claims this was due to an organized fraud scheme, and filed suit against the individuals and entities that it claims were in charge of APS. Prior to the merger, APS was a portfolio company of GTCR Golder Rauner II ("GTCR"), a private equity firm. David Katz was a Managing Director of GTCR, which is the general partner of GTCR Co-Invest and GTCR Partners IX. (*Id.* ¶¶ 15, 18). GTCR Partners IX, in turn, is the general partner of GTCR Fund IX/A and GTCR Fund IX/B.[1] (*Id.* ¶ 16). GTCR Co-Invest, GTCR Fund IX/A, and GTCR Fund IX/B are all limited partners of Partners Healthcare Solutions Holdings, L.P. ("APSLP"),[2] a

---

[1] The Complaint divides Defendants into four categories. The first category, comprised of all the GTCR entities, is referred to collectively as the "GTCR Defendants." Katz, by himself, constitutes the second category.
[2] APSLP, by itself, constitutes the third category of defendants.

2

Delaware limited partnership that was formed to hold APS. (*Id.* ¶¶ 17, 19). The leadership of APS was organized as follows: Gregory Scott served as the CEO, Jerome Vaccaro as the President and COO, and John McDonough as the CFO. (*Id.* ¶¶ 21-23, 41). McDonough, Scott, and Vaccaro[3] are all named defendants in this case, and served as limited partners of APSLP. (*Id.* ¶ 19). Defendants Katz and Scott also sat on APS's five-member board. (*Id.* ¶ 39).

Universal asserts fifteen counts ranging from securities fraud and common law fraud to aiding and abetting and unjust enrichment. Defendants have moved to dismiss Counts I–XI, XIII, and XV of Universal's First Amended and Supplemental Complaint for failure to state a claim upon which relief can be granted. (D.I. 44). Each relevant count will be addressed below.

## II. LEGAL STANDARD

Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept the complaint's factual allegations as true, but may disregard any legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). There must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely

---

[3] Collectively, these three are the fourth category, the "Individual Defendants."

consistent with a defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief." (quotation marks omitted)).

## III.   DISCUSSION

### A.   Securities Fraud Under Section 10(b) (Count I)

Universal alleges that Scott, Vaccaro, McDonough, and APSLP committed securities

fraud under Section 10(b) of the Securities Exchange Act of 1934.  In order to state a claim

under Section 10(b), the plaintiff must allege: "(1) a material misrepresentation or omission by

the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184,

1191-92 (2013) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36-38 (2011)).

Pursuant to Federal Rule of Civil Procedure 9(b), the above elements must be pled "with

particularity," and, under the Private Securities Litigation Reform Act ("PSLRA"), the pled facts

must give "rise to a strong inference that the defendant[s] acted with the required state of mind."

15 U.S.C. § 78u-4(b)(2); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253-54 (3d Cir.

2009); *see also In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)

("Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud

with all of the essential factual background that would accompany 'the first paragraph of any

newspaper story'—that is, the 'who, what, when, where and how' of the events at issue."). A

strong inference of scienter "is one that is 'cogent and at least as compelling as any opposing

inference of nonfraudulent intent.'" *Avaya*, 564 F.3d at 267 (quoting *Tellabs, Inc. v. Makor

Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

4

Defendants argue that Universal has failed to plead with particularity that specific misrepresentations or omissions were "made." Defendants also contend that Universal has failed to allege facts that give rise to a strong inference of scienter, and that Universal has failed to plead the element of reliance. These arguments are addressed separately.

### i. Particularity in Alleging Misrepresentations

In the opinion granting Defendants' first Motion to Dismiss, the Court held that "[t]he amended complaint should lay out, with particularity, each fraudulent statement or representation, its materiality, which specific defendant made the representation, when it was made, why it was false or misleading, scienter, and explain how Universal relied on it." (D.I. 36 at 6). Defendants argue that Universal has failed to do this. (D.I. 45 at 20-24). Specifically, Defendants argue that by grouping certain Defendants together in its complaint, Universal relies on "'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the [PSLRA]." *Rockefeller*, 311 F.3d at 224 n.19 (quoting *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001)). I disagree.

"The PSLRA requires [a plaintiff] to specify the role of each defendant, demonstrating each Defendant's involvement in misstatements and omissions." *Winer Family Tr. v. Queen*, 503 F.3d 319, 335-36 (3d Cir. 2007). In suits involving multiple defendants, "securities fraud plaintiffs [must] distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 649 n.57 (E.D. Va. 2000) (quotation marks omitted). Only the "maker" of a fraudulent statement may be held liable under Section 10(b). *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 (2011). The maker of a statement is a "person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 2302.

5

"Nothing in *Janus* precludes a single statement from having multiple makers." *Glickenhaus &*

*Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015); *see also City of Pontiac Gen.*

*Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).

The Court concludes that the complaint adequately alleges particular misrepresentations

with respect to APSLP, Scott, and McDonough. For each, the complaint lays out "each

fraudulent statement . . ., which specific defendant made the representation, [and] when it was

made." (D.I. 36 at 6). Universal alleges that Scott "signed the Merger Agreement on behalf of

both APSLP and APS" and that he signed the Officer's Certificate, certifying the representations

on behalf of APS, while also acting as the agent of APSLP. (D.I. 39 ¶¶ 90-91, 107). The

complaint further lays out how the various representations within the Merger Agreement and the

Officer's Certificate were fraudulent. With respect to McDonough, the complaint specifically

alleges that McDonough made numerous oral misrepresentations on December 13, February 14,

and February 29. (*Id.* ¶¶ 139, 147).

Defendants contend, relying on *Janus*, that McDonough cannot be the "maker" of his

statements because the complaint provides that these statements were made "on behalf of APS

and APSLP." (D.I. 45 at 24 (quoting D.I. 39 ¶¶ 139, 147)). Defendants misread *Janus*. The

Supreme Court, in *Janus*, addressed a situation where one legal entity (an investment advisor)

was involved in the preparation of statements contained in another entity's (an investment fund)

SEC filings. *Janus*, 131 S. Ct. at 2305. There, the Court held that because the investment fund

had the ultimate authority over the statements, it "made" the statements.[4] *Id.* Since *"Janus* [did]

---

[4] The Court agrees that "nothing in the Court's decision in *Janus* limits the key holding . . . to legally
separate entities." *Haw. Ironworkers Annuity Tr. Fund v. Cole*, 2011 WL 3862206, at *3 (N.D. Ohio
Sept. 1, 2011). The "analysis applies equally to whether [some defendants] may be held liable for the
misstatements of their co-defendants." *In re Coinstar, Inc. Sec. Litig.*, 2011 WL 4712206, at *10 (W.D.
Wash. Oct. 6, 2011). The key determination is "ultimate authority," where "[t]he degree of separation

6

not alter the well-established rule that 'a corporation can act only through its employees and

agents,'" a corporate insider may "make" a statement—for purposes of Section 10(b)—"pursuant

to his responsibility and authority to act as an agent" of the corporation. *In re Merck & Co., Inc.*

*Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at \*25 (D.N.J. Aug. 8, 2011) (quoting *Suez*

*Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)). In such an

instance, the corporate insider may have the "ultimate authority" over the statement. *Janus* does

not insulate corporate officers from liability where the plaintiff "can plead, and ultimately prove,

that those officers . . . had 'ultimate authority' over the statement." *Id.* Defendants' reading of

*Janus*, "taken to its logical conclusion . . . would absolve corporate officers of primary liability

for all Rule 10b-5 claims, because ultimately, the statements are within the control of the

corporation which employs them." *Id.*; *see also Glickenhaus*, 787 F.3d at 427. The complaint

contains sufficient allegations to conclude, at the motion to dismiss stage, that McDonough

"made" certain misrepresentations.

    While Universal adequately alleges misrepresentations as to APSLP, Scott and

McDonough, it fails to do so with respect to Vaccaro. Universal's complaint directs no

individualized allegations at Vaccaro. Instead, the complaint lumps Vaccaro together with

McDonough and/or Scott, making only vague allegations about his participation in preparing

certain documents and presentations. For instance, the complaint alleges "Scott, Vaccaro, and

McDonough collectively prepared and delivered a presentation to Universal senior management"

(D.I. 39 ¶ 55), and that "Scott, Vaccaro, and McDonough created and delivered a presentation to

the Universal Board of Directors." (*Id.* ¶ 59). This is insufficient. Although "*Janus* recognized

that attribution could be 'implicit from surrounding circumstances,'" the key question is whether

---

between entities will inform the analysis of where [that] ultimate authority lies." *Haw. Ironworkers*, 2011
WL 3862206, at \*3.

a person or entity has authority over a statement. *City of Roseville Emps. Ret. Sys. v. Energy Sols., Inc.*, 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011) (quoting *Janus*, 131 S. Ct. at 2302). Universal fails to allege any specific facts or "surrounding circumstances" that show Vaccaro was a "person or entity with ultimate authority over [any particular] statement, including its content and whether and how to communicate it." *Janus*, 131 S. Ct. at 2302. Therefore, Vaccaro cannot be held liable under Section 10(b). *See, e.g., Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1356 (S.D. Fla. 2015) ("[C]ull[ing] together and disseminat[ing] information to the public that turned out to be false . . . . [is] insufficient to support a finding that a defendant is the maker of the alleged misrepresentation."); *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 594-95 (E.D. Pa. 2009). Count I is therefore dismissed with respect to Vaccaro.

### ii. Inference of Scienter

Defendants contend that Universal has failed to plead facts giving rise to a strong inference of scienter. Specifically, Defendants argue that Universal relies on improper "group pleading" and further, that Universal "ignor[es] the fact that the § 10(b) defendants received a considerable amount of [Universal] stock in exchange for the sale of APS, making them vulnerable to any ill-effects of their own representations, and thus decreasing the likelihood that any misrepresentations were made deliberately." (D.I. 45 at 24).

For each of APSLP, Scott, and McDonough, the complaint adequately pleads scienter. Universal alleges, for instance, that Scott falsely certified in the Officer's Certificate that no material adverse effects ("MAEs") had occurred since the execution of the Merger Agreement. (D.I. 39 ¶¶ 133-34). The complaint explains how APSLP and Scott knew, or recklessly disregarded, that this representation was false. (*Id.* ¶ 95). Universal alleges that when

8

McDonough reaffirmed the 2012 Budget forecast during his phone calls with Universal on February 14 and 29, he had actual knowledge of at least five MAEs, which "would be expected to reduce APS's forecast of 2012 EBITDA by over $11 million, or 25 percent." (*Id.* ¶¶ 103-05). Additionally, "when multiple promised events fail to occur, there is a point where a strong inference of fraud can be made." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 881 (3d Cir. 2000). Universal alleges that a series of "new business pipelines," "which contained the names of each prospective client, the probability of winning the new contract, and the amount of revenue to be generated in 2012, were a brazen series of lies." (D.I. 39 ¶ 9). The Individual Defendants and Katz withheld the real pipeline from Universal because, Universal alleges, its disclosure would "open up a hornet's nest." (*Id.*; *see also id.* ¶¶ 78, 101). Ultimately, "[o]f more than 30 potential contracts [that Universal was assured] were likely to provide revenue in 2012, *only two* in fact generated revenue in that year, in the amount of $350,000 – an unimaginable 98.7% shortfall." (*Id.* ¶ 9; *see also id.* ¶¶ 136-38, 142, 146). The complaint lays out how each officer knew, or recklessly disregarded, that each of these pipelines was false. (*See, e.g., id.* ¶¶ 56, 57). The temporal proximity of the misrepresentations in relation to the truth's revelation may also be considered in determining whether alleged facts give rise to a strong inference of scienter. *Avaya*, 564 F.3d at 272. Universal alleges that, within six weeks of closing, the Individual Defendants decreased their EBITDA forecast by forty percent, and within four months, the forecast was further reduced by ninety percent. (*Id.* ¶¶ 10, 110). Additionally, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. Scott and McDonough had "powerful motives to conceal the truth about APS's business." (D.I. 39 ¶ 61). "[T]hey would be able to exchange their illiquid and worthless APS shares for valuable, publicly traded shares of Universal . . . [and] would increase their personal

compensation by as much as 40 percent." (*Id.* ¶¶ 61, 152-53). These allegations are sufficient to give rise to a strong inference of scienter.

Contrary to Defendants' assertions, Universal does not advance any "group pleading" theory in its complaint. "The group pleading doctrine is a judicial presumption that statements in group-published documents . . . are attributable to officers and directors who have day-to-day control or involvement in regular company operations." *Winer*, 503 F.3d at 335. Since the "doctrine allows a plaintiff to plead that defendants made a misstatement or omission of a material fact without pleading particular facts associating the defendants to the alleged fraud," the Third Circuit has held that the doctrine did not survive the enactment of the PSLRA. *Id.* at 335-37. Universal's complaint is devoid of any allegations that any statements in documents are attributable to any defendant "on the basis of their titles" or "their general level of day-to-day involvement." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004); *see also Winer*, 503 F.3d at 335-37. Thus, while the complaint does group certain plaintiffs together when alleging certain actions, it does not rely on the group pleading doctrine.

Defendants also argue that the receipt of Universal stock militates against an inference of scienter, relying on cases which find that a "compelling inference against scienter is raised" when defendants increase their stock holdings. *Percoco v. Deckers Outdoor Corp.*, 2013 WL 3584370, at *6 (D. Del. July 8, 2013); *see also Monk v. Johnson & Johnson*, 2011 WL 6339824, at *12 n.12 (D.N.J. Dec. 19, 2011). Here, the fact that the Individual Defendants received Universal stock as consideration does not preclude an inference of scienter. The Individual Defendants exchanged their APS stock for Universal stock, which has value independent of the APS's performance. (D.I. 39 ¶¶ 61, 111, 152). The "compelling inference against scienter," found in cases like *Percoco* and *Monk*, is animated by the intuition that a defendant would not

10

sink his own ship. This inference is not implicated in a situation where, as here, the defendants acquire stock in an entity with independent value.

Therefore, the complaint alleges facts sufficient to support a strong inference of scienter.

### iii. Pleading Reliance

Defendants also argue that Universal has failed to show reliance on any extra-contractual misrepresentations made before the execution of the Merger Agreement. The reliance element (also known as "transaction causation") requires that a plaintiff show that it "entered the transaction at issue in reliance on the claimed misrepresentation or omission." *McCabe v. Ernst & Young LLP*, 494 F.3d 418, 425 (3d Cir. 2007). "The most traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011)). Universal alleges that if it had "known the appalling truth, it never would have bought APS." (D.I. 39 ¶ 1; *see also id.* ¶ 165). Further, Universal specifically alleges that it "relied on the material misrepresentations and omissions [of the Individual Defendants] . . . in deciding whether or not to acquire APS . . . and in deciding whether to close the Transaction." (*Id.* ¶ 219; *see also id.* ¶¶ 102, 163(a), 164, 198). These allegations, taken as true, are sufficient to plausibly suggest that Universal "entered the transaction . . . in reliance on the claimed misrepresentation[s] or omission[s]." *See McCabe*, 494 F.3d at 425. The count cannot be dismissed on this basis.

Therefore, Defendants' motion to dismiss Count I is granted with respect to Vaccaro and denied with respect to Scott, McDonough, and APSLP.

### B.   Control Person Liability Under Section 20(a) (Counts II and III)

11

Universal alleges control person liability under Section 20(a) of the Securities Exchange

Act against Scott, Vaccaro, McDonough, and APSLP (Count II), and against Katz and the GTCR

Defendants (Count III).[5] Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable . . . unless the controlling person
> acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a). To state a claim under Section 20(a), the plaintiff must show: "(1) an

underlying violation by a controll[ed] person or entity; (2) that the defendants are 'controlling

persons;' and (3) that the defendants were in some meaningful sense culpable participants in the

fraud." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002) (quotation

marks omitted), *aff'd*, 357 F.3d 322 (3d Cir. 2004); *see also Belmont v MB Inv. Partners, Inc.*,

708 F.3d 470, 484-85 (3d Cir. 2013). "[T]he heightened standard of the PSLRA requires that a

claim under Section 20(a) state with particularity the circumstances of both the defendants'

control of the primary violator, as well as of the defendants' culpability as controlling persons."

*In re Digital Island*, 223 F. Supp. 2d at 561; *see also Snowstorm Acquisition Corp. v. Tecumseh*

*Prods. Co.*, 739 F. Supp. 2d 686, 707 (D. Del. 2010). Culpable participation may only be based

on inaction if the plaintiff proves both knowledge of the underlying fraud and that the inaction

was "deliberate and done intentionally to further the fraud." *Belmont*, 708 F.3d at 485; *see also*

*Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975). Additionally, "it is well-settled

that the mere fact that an individual is a director of a firm is not sufficient to show he is a

---

[5] The Court previously concluded that the allegations against the GTCR Defendants were sufficiently
pleaded. (D.I. 36 at 8-9).

controlling person of the firm." *In re Digital Island*, 223 F. Supp. 2d at 561 (quotation marks and alterations omitted).

Universal alleges that "[n]on-party APS committed a primary violation of Section 10(b) of the Exchange Act with respect to the material misrepresentations and omissions in the Merger Agreement, the Company Disclosure Letter, and the Officer's Certificate," and with respect to a misrepresentation made by an APS in-house lawyer about a software license. (D.I. 39 ¶ 183). The complaint alleges that Katz, Scott, Vaccaro, McDonough, and APSLP acted as controlling persons of APS. (*Id.*). Defendants argue that the complaint fails to state a Section 20(a) claim. Since the analysis with respect to Katz differs from that in regards to the Individual Defendants (and APSLP), Katz is addressed separately.

### i. Katz

In the opinion granting Defendants' first motion to dismiss, the Court stated that "Universal should plead with particularity facts showing that Katz had primary responsibility for APS's overall management and day-to-day operations or was a 'major player' in those operations." (D.I. 36 at 8). Defendants argue that Universal has failed to do so. I disagree. Universal spells out the major role that Katz played in the sale of APS to Universal. The complaint alleges that Katz "personally negotiated all material terms of the [merger], including price, with Universal's Chairman." (D.I. 39 ¶¶ 54, 76-77). He exchanged "approximately 300 emails directly with Universal's top management." (*Id.* ¶ 54). Katz coordinated the flow of information from APS, through the Individual Defendants, to Universal. (*Id.* ¶¶ 54-55, 72). The complaint explains that Katz "was an aggressive, hands-on manager," who exchanged "thousands of emails" with APS management. (*Id.* ¶¶ 40-42). This is more than sufficient to show that Katz "was a 'major player'" in APS's "overall management and day-to-day

operations." (D.I. 36 at 7-8); *see also Snowstorm*, 739 F. Supp. 2d at 707-08.  Universal has sufficiently pleaded the element of control.

The complaint also adequately pleads Katz's "culpable participation" in the underlying fraud APS is alleged to have committed.  Universal specifically alleges that Katz, with knowledge of the underlying fraud, intentionally "prevented the discovery of the fraud." *Belmont*, 708 F.3d at 485.  For instance, Katz hid "material deficiencies" in APS's obligations under the Customer B contract when he emailed Universal's Chairman on December 26, 2011. (D.I. 39 ¶¶ 80, 95(d), 157(h)).  Katz prevented APS from meeting with APS's outgoing Chief Compliance Officer, due to his "own suspicions that the CCO would be a whistleblower." (*Id.* ¶ 159(d); *see also id.* ¶¶ 44, 85-87).  These allegations are more than sufficient. *See, e.g., Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 315 (D. Del. 2001) (allegation that former officers and directors "each signed an SEC filing knowing that the filing contained an omission that would likely mislead the market . . . demonstrates culpable conduct").

The motion to dismiss is therefore denied with respect to Count III.

### ii. Individual Defendants and APSLP

Defendants assert that the complaint untenably alleges that Scott, Vaccaro, and McDonough are both engaged in fraud as primary violators (under Section 10(b)) and as controlling persons of those underlying primary violators.  (D.I. 45 at 28-29).  In other words, they are both "the controller and the controlled." *In re Regal Commc'ns Corp. Sec. Litig.*, 1996 WL 411654, at *4 (E.D. Pa. July 17, 1996); *see also Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999).  Defendants contend this is grounds for dismissal of the § 20(a) claim, as the Individual Defendants cannot be both the controller and the controlled.

14

There is no rule that prevents a plaintiff from alleging a § 20(a) violation and § 10(b) violation against the same defendant. As acknowledged by several courts, *Regal* and *Kalnit* do not hold otherwise. *See, e.g., In re Van der Moolen N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 412 (S.D.N.Y. 2005); *Sheehan*, 136 F. Supp. 2d at 313-15. In *Kalnit* and *Regal*, the respective plaintiffs sought to hold individual defendants liable as controllers for the very misrepresetations they were alleged to have made. *See Kalnit*, 85 F. Supp. 2d at 246; *In re Regal*, 1996 WL 411654, at *4. "[T]he logical inconsistency that required dismissal of the Section 20(a) claim in *Kalnit* [may] not [be] present . . . [when] multiple misrepresentations and omissions by various of the Defendants have been alleged, and it is conceivable that one defendant ultimately might be found to be a primary violator while another defendant might be found to be a control person under Section 20(a)." *In re Van der Moolen*, 405 F. Supp. 2d at 412. Here, I am not convinced there is any "logical inconsistency" which results from Universal's allegations, since there are numerous misrepresentations alleged against multiple defendants. Thus, the complaint need not be dismissed on this basis.

Defendants also argue that Universal fails to plead control with the requisite particularity. Control is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12(b)-2; *see also Rochez Bros.*, 527 F.2d at 890; *Snowstorm*, 739 F. Supp. 2d at 707. Defendants contend that Universal impermissibly seeks to establish control "simply by referencing a defendant's position as an officer or director of the purported primary violator." (D.I. 45 at 29 (citing *Skeway v. China Nat. Gas, Inc.*, 2012 WL 2877645, at *1 (D. Del. July 6, 2012))). Universal contends its complaint "explains how Scott, Vaccaro, and McDonough not only had the titles of CEO, COO and CFO but also acted as such,

15

creating and delivering . . . virtually all of the fraudulent documents and oral misrepresentations

fed to Universal." (D.I. 48 at 31). Universal then asserts that "[t]he allegations here are more

like those in [*Snowstorm*]," since it "has adequately pled the role of each of Scott, Vaccaro and

McDonough in controlling APS, the company they were paid to run." (*Id.*). Universal does not

specifically reference any pertinent allegations in the complaint. I do not think this is an

oversight, as I too cannot unearth any from the 104-page complaint. General allegations

pertaining to "management responsibilities fail to allege [control] with the requisite specificity,"

as the control person must be shown to "possess[] actual control over the transactions in

question." *See In re Digital Island*, 223 F. Supp. 2d at 560-61; *Skeway*, 2012 WL 2877645, at

*1.

      Defendants also argue that the complaint fails to adequately plead "culpable

participation." Universal argues that culpable participation is adequately alleged, as the

complaint explains that Vaccaro and McDonough "knew of the many misrepresentations in the

Merger Agreement and Officer's Certificate, including some that referred to Vaccaro's and

McDonough's own knowledge." (D.I. 48 at 31-32; D.I. 39 ¶¶ 123-35; *see also id.* ¶ 91).

Further, the complaint alleges that Scott and Vaccaro "both knew that numerous MAEs had

occurred between signing and closing." (D.I. 39 ¶ 147). "[P]leading *knowledge* of the facts

underlying the fraud, or even knowledge of the fraud itself, is simply not enough to establish

culpable *participation* in the securities violation by an allegedly controlling person."

*Steamfitters Local 449 Pension Fund v. Alter*, 2011 WL 4528385, at *11 (E.D. Pa. Sept. 30,

2011); *see also In re Digital Island*, 223 F. Supp. 2d at 563 (dismissing Section 20(a) claims

where the complaint "was utterly lacking in any details as to when or how [any participation]

occurred," even though the complaint pleaded "a factual predicate for the individual defendants'

knowledge of the purported misstatements"). Beyond allegations of knowledge, Universal merely alleges that Scott, Vaccaro, and McDonough "culpably participated" in the alleged fraud. (D.I. 39 ¶ 184(a)). Universal argues it has "[p]led [c]ulpable [p]articipation [t]hrough [d]etailed [f]actual [a]llegations of [a]ctual [k]nowledge of the [f]alsity of . . . [s]tatements." (D.I. 48 at 32). Actual knowledge with "vague alleg[ations] that the individual defendants 'participated' in the purported omissions" is not sufficient. *Digital Island*, 223 F. Supp. 2d at 563. Universal must plead both knowledge of the underlying fraud and that the inaction was "deliberate and done intentionally to further the [underlying] fraud." *Belmont*, 708 F.3d at 485. It has not done so.

Therefore, for two independent reasons, Count II is dismissed for failing to state a claim upon which relief could be granted.

### C. Common Law Fraud Based on Extra-Contractual Statements and Omissions (Counts VII, VIII, IX, X, XI, and XIII)

Universal asserts claims of fraud and fraud in the inducement against Scott, Vaccaro, McDonough, Katz, and APSLP. To state a claim for common law fraud, Universal must plead facts supporting an inference that: "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *See Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). Delaware law permits parties to define "those representations of fact that formed the reality upon which the parties premised their bargain." *Id.* at 1058. "[S]ophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a

part of the basis for their decision to contract." *Id.* at 1056 (quoting *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 n.18 (Del. Ch. 2003)). To be effective, a contract "must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004).

In granting the first motion to dismiss, the Court stated that Universal would be "permitted to amend its complaint, because, similar to the contract in [*TransDigm Inc. v. Alcoa Global Fasteners, Inc.*, 2013 WL 2326881 (Del. Ch. Feb. 1, 2013)], the language of Section 3.34 does not contain an express waiver with respect to the accuracy or completeness of the information provided by the Defendants." (D.I. 36 at 11). In *TransDigm*, the Delaware Court of Chancery denied a motion to dismiss for fraudulent, active concealment based on an anti-reliance provision which did not "disclaim reliance on extra-contractual *omissions*" or provide that "TransDigm was making . . . [a] representation as to the 'accuracy and completeness' of information . . . provided." *TransDigm*, 2013 WL 2326881, at *7-9. The court distinguished *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107 (Del. 2012), holding that the agreement at issue in *RAA* and the cases upon which it relied "contained language expressly disclaiming reliance on both the *omission* of information and extra-contractual *representations.*" *TransDigm*, 2013 WL 2326881, at *9.

Since *TransDigm* appeared at the time to be the sole guidance from the Delaware state courts on the extra-contractual omission theory, the Court was persuaded to follow it. *See McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661-63 (3d. Cir. 1980). Recently, however, the Court of Chancery issued another decision on the subject. *See Prairie Capital III, L.P. v. Double*

18

*E Holding Corp.*, 2015 WL 10464814, at \*9-12 (Del. Ch. Nov. 24, 2015). There, the court held

that because parties in an arms' length contractual setting "begin[] the process without any

affirmative duty to speak, any claim of fraud . . . . cannot start from an omission." *Id.* at \*9.

"[T]herefore, contractual provisions that identify the representations on which a party

exclusively relied define the universe of information that is in play for a fraud claim." *Id.*

Further, the court stated that the effect of the anti-reliance clause at issue "extend[ed] to claims

based on omissions," and "[t]o the extent *TransDigm* suggests that an agreement must use a

magic word like 'omissions,' then [it] respectfully disagree[d] with that interpretation." *Id.* at

\*12. With respect to *TransDigm*, I am inclined to agree with *Prairie Capital*. "Every

misrepresentation, to some extent, involves an omission of the truth." *Id.* at \*10 (quoting

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391, 400 (D.

Del. 2014)). "When parties identify a universe of contractually operative representations in a

written agreement, they remain in that universe . . . [and] cannot escape through a wormhole into

an alternative universe of extra-contractual omissions." *Prairie Capital*, 2015 WL 10464814, at

\*10; *see also Abry*, 891 A.2d at 1058.

Here, the Merger Agreement's Section 3.34, entitled "No Other Agreements," provides,

in relevant part:

> WITHOUT LIMITING PARENT'S RECOURSE AS ELSESWHERE SET FORTH IN
> THIS AGREEMENT (OR ANY ANCILLARY AGREEMENT CONTEMPLATED
> HEREBY), EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES
> EXPRESSLY MADE BY THE COMPANY IN THIS <u>ARTICLE 3</u>, NONE OF APSLP,
> THE COMPANY OR ANY SUBSIDIARY OF THE COMPANY OR ANY APSLP
> RELATED PERSON HAS MADE OR AUTHORIZED THE MAKING OF ANY
> REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED,
> CONCERNING THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, BUT
> NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A
> PARTICULAR PURPOSE. *NEITHER PARENT NOR THE MERGER SUB IS RELYING
> OR HAS RELIED ON ANY REPRESENTATIONS AND WARRANTIES EXCEPT FOR
> THOSE EXPRESSLY MADE BY THE COMPANY IN THIS <u>ARTICLE 3</u> (OR THE*

CERTIFICATE DELIVERED PURSUANT TO <u>SECTION 6.2(h)(i)</u> OF THIS
AGREEMENT)).

(D.I. 46, Ex. A at 63-64, § 3.34 (italicization added)).[6] The parties also included an integration

clause, which provides that Merger Agreement, along with certain other written agreements,

"constitute the entire agreement among the parties with respect to the matters covered hereby and

supersedes all previous written, oral or implied understandings among them with respect to such

matters." (*Id.* at 113, § 8.12). These sections of the agreement "combine to mean that

[Universal] did not rely on other information" outside the Merger Agreement's Article 3 or the

Officer's Certificate.[7] *Prairie Capital*, 2015 WL 10464814, at *8. "If a party represents that it

only relied on particular information, then that statement establishes the universe of information

on which that party relied." *Id.*; *see also FdG Logistics LLC v. A & R Logistics Holdings, Inc.*,

2016 WL 819215, at *13 (Del. Ch. Feb. 23, 2016). Universal, the "parent" under Section 3.34,

stated that it relied exclusively on the representations and warranties in the Merger Agreement

and the Officer's Certificate. This statement, when viewed along with the integration clause,

"add[s] up to a clear anti-reliance clause." *Kronenberg*, 872 A.2d at 593.

---

[6] A similar anti-reliance provision, addressing what APS may rely upon, is found at the end of Article 4, which deals with the representations and warranties of the parent and the merger sub. (*See id.* at 72, § 4.15). I note that, in this 109-page agreement, the only other section written entirely in capital letters— aside from a quotation set forth in Section 2.8(b)—is Section 8.8(b), which relates to waiver of the right to trial by jury. (*See id.* at 112, § 8.8(b)).

[7] The Court notes that the contractual language at issue in *Prairie Capital* differs from that at issue here. The language in *Prairie Capital* included a provision stated that the Buyer "relied on . . . the results of its own independent investigation" and "the representations and warranties of the Double E Parties expressly and specifically set forth in this Agreement." *Prairie Capital*, 2015 WL 10464814, at *7. The clause also stated: "THE BUYER UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED . . . ARE SPECIFICALLY DISCLAIMED BY THE DOUBLE E PARTIES." *Id.* While the exact language differs, I see no reason to depart from the logic of *Prairie Capital*. Where, as here, a contracting party has specifically disclaimed reliance on extra-contractual statements, "[t]he critical distinction is not between misrepresentations and omissions, but between information identified in the written agreement and information outside of it." *Id.* at *9.

Universal also argues that statements made after the Merger Agreement was signed, but before closing, are not encompassed by the anti-reliance clause. (D.I. 48 at 35). Since the Merger Agreement explicitly references the delivery of the Officer's Certificate, and that its representations are not subject to the anti-reliance provision, the anti-reliance effect of the Merger Agreement extends to extra-contractual representations made during the period between signing and closing. Any other reading would render nugatory the exclusive effect of the representations in the Officer's Certificate. That is, if the Merger Agreement only applied to statements prior or contemporaneous to it, any subsequent representations—including those in the Officer's Certificate—could be relied upon. There would be no need to single out the Officer's Certificate as something that could be relied upon if everything after the signing of the Merger Agreement could be relied upon. Thus, such a reading would result in surplus contractual language, which should be avoided. *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does not render any provisions illusory or meaningless." (quotation marks omitted)). The anti-reliance clause is therefore not an ambiguous provision that is "reasonably or fairly susceptible" to different interpretations. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003). Universal's interpretation is therefore rejected.

Universal largely premises its common law fraud claims on Defendants' extra-contractual representations. Counts VII through IX are expressly based on "Extra-contractual Statements and Omissions." Counts X and XI are based, in part, on extra-contractual statements. Since the statements or omissions, whenever made, are not encompassed within "the universe of information that is in play for a fraud claim," they cannot sustain Universal's common law fraud claims. *Prairie Capital*, 2015 WL 10464814, at *9; *see also Abry*, 891 A.2d at 1058. If

21

Universal relied on certain representations by Defendants, it should have included those representations in their agreement. "[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim." *Abry*, 891 A.2d at 1057. Count VII must therefore be dismissed. To the extent Count X relies on extra-contractual representations or omissions, it is dismissed. Counts VII, IX, XI, and XIII are derivative of the underlying fraud claims in Counts IV, VII, and X. To the extent these counts rely on extra-contractual statements or omissions, they are dismissed.

### D.    Common Law Fraud Claims Based on Contractual Misstatements (Counts IV, V, VI, X, XI, and XIII)

The Court previously held that *Abry* "clearly allows fraud claims based on representations contained in the Merger Agreement and the Officer's Certificate," and that those claims "are properly alleged against APSLP and Scott." (D.I. 36 at 9); *see Abry*, 891 A.2d at 1064 (public policy of Delaware does "not permit [a contracting party] to insulate itself" from liability for fraudulent acts); *Ameristar Casinos, Inc. v. Resorts Int'l Holdings, LLC*, 2010 WL 1875631, at *11 (Del. Ch. May 11, 2010) ("[A] fraud claim can be based on representations found in a contract."). Defendants argue Universal's common law fraud claims amount to impermissible "bootstrapping." (D.I. 45 at 16-17); *see Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010) (A plaintiff "cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." (quoting *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998))). Defendants argue that Universal's fraud claims are "a collection of breach of contract claims, each alleging that there was some detail about a customer

22

contract that Defendants did not disclose." (D.I. 45 at 17); *see Data Mgmt. Internationalé, Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del. Super. Ct. July 25, 2007) ("Even an intentional, knowing, wanton, or malicious action by the defendant will not support a tort claim if the plaintiff cannot assert wrongful conduct beyond the breach of contract itself."). While Defendants' assessment of the law is correct, its characterization of the complaint's factual allegations is not. Universal does not merely allege that Defendants failed to comply with their disclosure obligations under the agreement; Universal alleges that certain contractual statements were false. (*See* D.I. 48 at 33 (citing D.I. 39 ¶¶ 4, 5, 6, 50-52, 62-67, 79, 88-89, 91, 95, 105, 107, 109, 113-16, 123-24, 130, 133-34)). I conclude that Universal has properly alleged common law fraud based on contractual misstatements.

The parties dispute whether these claims are properly alleged against Vaccaro and McDonough. As the Court stated in its first opinion, they did not sign the Officer's Certificate. (D.I. 36 at 9). Universal argues that the claims should be sustained, with respect to Vaccaro and McDonough, under *Anvil Holding Corp. v. Iron Acquisition Co.*, 2013 WL 2249655, at *6-7 (Del. Ch. May 17, 2013). The *Anvil Holding* court denied a motion to dismiss with respect to individual defendants where it was "reasonably conceivable" that the individual defendants "not only knew the Company was making false representations and warranties, but actively concealed from the Buyer information that made those representations false." *Id.* at *7. The Court found that this active concealment, when considered in conjunction with the defendants' attendance at certain meetings, was "sufficient to make it reasonably conceivable that the Individual Defendants caused the Company to make a false representation in the Purchase Agreement." *Id.* Several other Delaware courts have followed *Anvil Holding*. *See, e.g., Aviation West Charters, LLC v. Freer*, 2015 WL 5138285, at *5-6 (Del. Super. Ct. July 2, 2015); *ITW Global Invs. Inc. v.*

23

*Am. Indus. Partners Capital Fund IV, L.P.*, 2015 WL 3970908, at \*11 n.131 (Del. Super. Ct. June 24, 2015). Here, the complaint alleges that the McDonough and Vaccaro are among "the individuals whose knowledge allegedly makes the [contractual] representations false." *Anvil Holding*, 2013 WL 2249655, at \*7; (D.I. 39 ¶¶ 6, 106-07, 133-34, 162, 164; *see generally id.* ¶¶ 50-123). The complaint further alleges that Vaccaro and McDonough, as senior managers of APS, "active[ly] concealed" the true state of APS and "participate[ed] in meetings leading up to the closing." *Anvil Holding*, 2013 WL 2249655, at \*7; (*see generally* D.I. 39 ¶¶ 1, 4, 22-23, 122-49). Therefore, the complaint pleads sufficient facts to plausibly suggest that Vaccaro and McDonough, through their involvement in the negotiation and sale, "caused [APS] to make . . . false representation[s] in the [Merger Agreement]." *Anvil Holding*, 2013 WL 2249655, at \*7; *see also Aviation West*, 2015 WL 5138285, at \*6. Counts IV, V, X, and XIII are therefore properly alleged against Vaccaro and McDonough.

I conclude that Defendants' motion to dismiss is denied with respect to Count IV. Counts V and VI, which are derivative of Count IV, also survive dismissal. Defendants' motion is also denied with respect to Counts X, XI, and XIII to the extent they are premised on contractual statements.

### E.     Declaratory Judgment Against Vaccaro (Count XV)

Defendants argue that the Court should decline to exercise jurisdiction over the declaratory judgment claim (Count XV). Defendants contend that this count, added after Vaccaro filed an action against Universal in the Court of Chancery, is merely "aimed at depriving [Vaccaro] of his chosen forum," and that this court should refrain from "exercis[ing] [its] discretionary jurisdiction in favor of the original forum." (D.I. 45 at 36 (citing *Stone St. Asset Tr. v. Blue*, 821 F. Supp. 2d 672, 679-80 (D. Del. 2011))).

24

The Declaratory Judgment Act provides that the exercise of jurisdiction is optional, stating that a court "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). Defendants urge that under the factors in *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491, 495 (1942), "Vaccaro's state law claims against UAM [in the Court of Chancery] are sufficiently 'parallel' to Count XV, mandating dismissal or abstention of such claims." (D.I. 45 at 37).

After this motion was filed, the Court of Chancery issued an order staying Vaccaro's case against Universal. *See Vaccaro v. APS Healthcare Bethesda, Inc.*, 2016 WL 519866, at *5 (Del. Ch. Feb. 9, 2016). Since the parallel case has been stayed, the basis for Defendants' motion is largely nullified. Therefore, the Court sees no basis to abstain from exercising jurisdiction.

Defendants' motion to dismiss is therefore denied with respect to Count XV.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss (D.I. 44) is **GRANTED IN PART** and **DENIED IN PART**. An appropriate order will be entered.